FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAY 23 2012

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CRIMINAL NO. 12-1250 |
| ) | |
| vs. ) | |
| ) | Counts 1-7: 18 U.S.C. § 1343: Wire Fraud. |
| DARYL J. HUDSON, III, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## INDICTMENT

The Grand Jury charges:

### Background

1. Hampden Kent Group, LLC ("HKG") is a limited liability company organized under the laws of the Commonwealth of Virginia. According to its website, HKG claims to maintain offices at 1701 Pennsylvania, Ave. NW, Washington, D.C. and at Guildhall Yard, London, England.

2. At all times relevant to this indictment, HKG held itself out as a project finance and development company. Among other services, HKG advertised its ability to locate and obtain debt funding for start-up businesses in the green energy sector. Through its website and other promotional materials, HKG claims to have undertaken numerous transactions in the areas of structured finance and corporate finance.

3. Defendant **DARYL J. HUDSON, III ("HUDSON")** is a 1979 graduate of Georgetown University Law Center who was admitted to practice law in the District of

Columbia. From 1982 to 1985 **HUDSON** served as an attorney in the Enforcement Division of the United States Securities and Exchange Commission. At all times relevant to this indictment, **HUDSON** served as Chairman and Chief Executive Officer of HKG.

4. Founded in 2006, Bluenergy Solarwind, Inc. ("BSI") is a Santa Fe, New Mexico based manufacturer of certain green energy related equipment. At all times relevant to this indictment, J.G., an individual whose identity is known to the Grand Jury, served as President of BSI.

5. As detailed below, between July 12, 2011 and August 19, 2011, both dates being approximate and inclusive, **HUDSON** designed and executed a scheme and artifice to defraud J.G. and BSI by falsely representing his ready access to reliable sources of debt funding for BSI.

6. In or about early 2011, J.G. began actively seeking approximately $80 million in debt funding in order to allow BSI to begin manufacturing certain new solar wind turbines for subsequent sale. In an effort to obtain this financing, in early 2011 J.G. attended a number of open-houses in the Santa Fe area. These open-houses were essentially networking events, designed to connect entrepreneurs with potential investors or other sources of business funding.

## The Scheme and Artifice

7. Through a series of introductions stemming from his attendance at an open house networking event, J.G. was ultimately referred to defendant **HUDSON** as someone who might be able to locate the type of funding BSI needed. By mid-July 2011, J.G. had contacted **HUDSON** to discuss the possibility of engaging HKG to locate and place the $80 million in debt funding that BSI needed.

8. In anticipation of HKG's potential engagement, on or about July 12, 2011,

**HUDSON** caused certain background materials to be provided to J.G. These materials included a template "Letter Agreement" as well as **HUDSON**'s "Curriculum Vitae." These materials also included an "HKG Client Brochure" which contained descriptions of various structured and corporate finance transactions supposedly undertaken by HKG between 1992 and 2010.

9. On or about July 12, 2011 J.G. participated in a conference call with **HUDSON** and a number of other individuals. This conference call consisted largely of J.G. providing **HUDSON** with an explanation of BSI's business plans and funding needs.

10. In the course of the same July 12 conference call, **HUDSON** provided J.G. with an explanation of the type of transactional structure that would best suit BSI's financing needs. **HUDSON** also explained how HKG could facilitate such a transaction for BSI. In particular, **HUDSON** informed J.G. that if BSI were to hire HKG, at that time HKG would provide BSI with a "loan commitment." **HUDSON** further informed J.G. that HKG would "attach to the loan commitment, to show good faith, some treasuries on deposit with the New York Federal Reserve Bank." **HUDSON** explained that these treasuries are owned by "a friendly institutional investor that we work with." **HUDSON**, however, cautioned J.G. that he "wouldn't recommend trying to close a loan" with this investor because "they need to make too much money." Rather, **HUDSON** informed J.G. that he had a strong relationship with a "finance company that [he] would prefer to close the deal with." **HUDSON** explained to J.G. that HKG has "a good closing history with this investor."

11. Also on or about July 12, 2011, **HUDSON** provided J.G. with a draft "Services Agreement." This "Services Agreement" set forth the basic terms on which HKG could be hired to locate the debt funding for BSI. In particular, the "Services Agreement" required BSI to pay

3

HKG a total retainer fee of $300,000. This sum was to be split into two parts, with $150,000 to be paid up front and the other $150,000 to be paid upon signing of an agreement to receive the $80 million in funding. In exchange for this fee, under the "Services Agreement" HKG agreed to "use its best efforts to obtain finance in accordance with [BSI]'s financial and operational objectives . . .." Finally, the "Services Agreement" contained an Arbitration Clause requiring that any dispute pertaining to the agreement be submitted to binding arbitration.

12. On or about July 14, 2011, J.G. participated in another conference call with **HUDSON**. The purpose of this call was to discuss in greater detail the nature of the services that HKG would provide under the Services Agreement and to answer some questions that J.G. had about the nature of the Agreement.

13. In the course of this July 14 conversation, **HUDSON** reiterated his promise that upon signing the "Services Agreement" and payment of the retainer, HKG would issue "a loan commitment supported by treasuries." According to **HUDSON**, this document would represent "a clear cut commitment." **HUDSON** informed J.G. that BSI could use this loan commitment to help obtain customer orders and equity funding and that the loan commitment would be provided "to assist you in triggering the process."

14. On or about July 15, 2011, **HUDSON** had another telephone conversation with J.G. In the course of this call, J.G. expressed his desire to engage HKG to secure funding as discussed in their previous conversations. J.G. noted, however, that BSI did not yet have the full $150,000 necessary to make the initial retainer payment. Rather, J.G. offered to pay approximately $80,000 by July 20, 2011 and to pay the remaining $70,000 within 30 days. **HUDSON** ultimately agreed to this arrangement.

15. Pursuant to this agreement, between July 20 and July 22, 2011, in three separate transactions, J.G. caused a total of $85,000 to be wired to HKG's bank account in Washington, D.C. in partial payment of HKG's retainer fee.

16. After receiving the first wire transfer of funds, on or about July 20, 2011, **HUDSON** sent J.G. a copy of HKG's Services Agreement by email, which **HUDSON** and J.G. both signed and executed on or about July 21, 2011.

17. On or about July 22, 2011, **HUDSON** sent another email to J.G., which attached a copy of a document entitled "Loan Commitment." The final paragraph of the Loan Commitment was entitled "Good Faith" and read as follows:

> We are including herewith a copy our investor source's safe keeping receipt from the Federal Reserve Bank of New York, verifying a deposit of US Treasuries in denominations of $500 million. The receipt term expires in 2015. We include this to make a good faith showing of our ability to perform.

18. Despite the above-quoted language, however, no such document was included with the Loan Commitment. Rather, in the same email described above, **HUDSON** informed J.G. that he would "monitor the incoming credit, to follow up with the treasuries receipt." In other words, **HUDSON** would provide the promised document upon receipt of the promised $80,000 payment toward HKG's retainer.

19. Several hours later, **HUDSON** received the last installment of the partial retainer payment from BSI. Upon receipt of the this wire transfer, on or about July 22, 2011, **HUDSON** sent an email to J.G. attaching a photocopy of a document entitled "Safekeeping Receipt." ("SKR") This document purported to be issued on letterhead from the Federal Reserve Bank of New York ("FRBNY"). The body of the document appeared to represent that a "valued client"

had on deposit with the FRBNY "U.S. Treasury Checks" in denominations of $500 million. Certain security codes and other figures contained on the SKR appeared to have been redacted by hand.

20. The SKR provided to J.G., was a false and fraudulent document. **HUDSON** provided this fraudulent document to J.G. in furtherance of the scheme to defraud J.G. and BSI.

21. On or about July 24, 2011, J.G. sent an email to **HUDSON** requesting more specific information concerning the SKR and HKG. **HUDSON** responded that he needed to speak with J.G. before sending anything further and promised to call J.G. the following day.

22. On or about July 25, 2011, **HUDSON** spoke with J.G. by telephone in order to respond to J.G.'s inquiries concerning the SKR, including the purpose of the redacted codes. In the course of this call, **HUDSON** explained to J.G. that the SKR was partially redacted because "any serious market professional could use those [codes] to basically cultivate that same investor." Nonetheless, **HUDSON** agreed to send J.G. an unredacted version of the SKR on the condition that J.G. maintain it in the strictest confidentiality. In the course of the same call, **HUDSON** once again explained to J.G. that the SKR represented "a good faith showing of available funds" but that it "is coming from an investor that I don't think can get the best deal for you." Shortly thereafter, **HUDSON** sent J.G. a copy of the unredacted SKR by email.

23. Following the July 25 call, J.G. began the process of compiling Letters of Intent ("LOI"s) from prospective customers of BSI products. As **HUDSON** explained in previous discussions, the LOIs were supposedly necessary in order to conduct an appropriate credit evaluation in anticipation of presenting the funding request to HKG's preferred funding source.

24. Despite J.G.'s efforts, however, through late July/early August 2011, **HUDSON**

expressed mounting frustration with J.G.'s supposed failure to provide sufficient LOIs and related customer information. Likewise, in an August 5 email J.G. noted that he was "very uncomfortable with the progress and the way Mr. **HUDSON** is conducting business."

25. Ultimately, in keeping with the design of **HUDSON**'s scheme and artifice, the business relationship between BSI and HKG deteriorated. On August 11, 2011, J.G. telephoned **HUDSON** and informed him of BSI's decision that it could no longer go forward with HKG. In the course of that call, J.G. offered to allow HKG to keep $25,000 of the retainer, but requested that the balance of the $85,000 retainer be returned to BSI. **HUDSON** abruptly refused this request and hung up on J.G.

26. Also on or about August 11, 2011, BSI's attorney sent a letter to **HUDSON** stating, that the FRBNY had confirmed that the SKR, previously provided to J.G. by **HUDSON**, was a false and fraudulent document. The letter further demanded the return of the full $85,000 retainer paid to **HUDSON** by BSI.

27. HKG did not respond to this letter or to the allegations concerning the falsity of the SKR. Rather, by letter dated August 19, 2011, HKG's attorney wrote to BSI's attorney alleging that BSI had breached the Services Agreement by among other things, misusing the "Federal Reserve safekeeping receipts." The August 19 letter sought total damages in the amount of $965,000 and demanded that BSI submit to binding arbitration to resolve these claims.

## Execution of the Scheme and Artifice

## Counts 1-7 Wire Fraud

28. The grand jury hereby realleges and reincorporated the allegations contained in paragraphs 1-27 as though fully set forth herein.

29.     On or about the dates and in the manner set forth below, in Santa Fe County, in the District of New Mexico and elsewhere, the defendant **DARYL J. HUDSON, III,** having knowingly and intentionally devised and engaged in a scheme and artifice to defraud and to obtain money or property be means of false or fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce writings, signs, signals and sounds for the purpose of executing said scheme and artifice to defraud:

| <u>Count</u> | <u>Date</u> | <u>Description of Wire</u> |
|---|---|---|
| 1 | July 12, 2011 | Telephone call with J.G. |
| 2 | July 14, 2011 | Telephone call with J.G. |
| 3 | July 22, 2011 | Email to J.G. with Commitment Letter |
| 4 | July 22, 2011 | Email to J.G. with SKR |
| 5 | July 25, 2011 | Telephone call with J.G. |
| 6 | July 25, 2011 | Email to J.G. |
| 7 | August 19, 2011 | Facsimile to Perry Bendicksen |

All in violation of 18 U.S.C. § 1343.

<u>Forfeiture Allegation</u>

Paragraphs 1- 29 and Counts 1-7 of this Indictment are incorporated as part of this section of the indictment as if fully re-alleged herein for the purpose of alleging forfeiture to the United States pursuant to 18 U.S.C. § 982 (a)(2), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

Upon conviction of any offense in violation of 18 U.S.C. § 1343, the defendant, **DARYL J. HUDSON, III,** shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2) any

property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such violation(s).  Upon conviction of any offense in violation of 18 U.S.C. § 1343, the defendant, **DARYL J. HUDSON, III**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to such offense.

Property to be forfeited to the United States includes but is not limited to the following:

MONEY JUDGMENT

> A sum of money equal to at least **$85,000** in United States currency, including any interest accruing to the date of the judgment, representing the amount of money constituting or derived from the offenses, or derived from proceeds traceable to the offenses.

SUBSTITUTE ASSETS:

If any of the above described forfeitable property, as a result of any act or omission of the defendants:

> 1. cannot be located upon exercise of due diligence;
>
> 2. has been transferred or sold to, or deposited with, a third person;
>
> 3. has been placed beyond the jurisdiction of the Court;
>
> 4. has been substantially diminished in value; or
>
> 5. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of defendants up to the value of the forfeitable property described above.

A TRUE BILL:

/s/
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney
05/17/12 8:31am